**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

<table>
<tr><td>ARNE SOREIDE,</td><td>:</td><td>Civil Action No. 10-2452 (RMB)</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Petitioner,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>v.</td><td>:</td><td><u>OPINION</u></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>WARDEN D. ZICKEFOOSE,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Respondent.</td><td>:</td><td></td></tr>
</table>

Petitioner, a federal prisoner currently confined at the Federal Correctional Institution at Fort Dix, New Jersey, has submitted a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241 ("Petition"), <u>see</u> Docket Entry No. 4, and prepaid his filing fee.  For the reasons detailed below, the Petition will be denied.

**I.  BACKGROUND**

**A.  PROCEDURAL BACKGROUND**

In December of 2009, Petitioner filed his original § 2241 petition; that filing resulted in initiation of <u>Soreide v. Zickefoose</u> ("<u>Soreide-I</u>"), Civil Action No. 09-cv-6067 (RMB).  <u>See Soreide I</u>, Docket Entry No. 1.  In light of the statements made in the original petition (which led the Court to believe that it might have jurisdiction over this matter), the Court directed Respondent to answer the Petition.  <u>See id.</u>, Docket Entry No. 3. However, in March 2010 and before Respondent's time to answer

expired, Petitioner filed a motion in <u>Soreide-I</u> seeking to amend his original petition. <u>See id.</u> Docket Entry No. 5. The content of that motion suggested that the Court had no jurisdiction over Petitioner's claims (since the motion indicated that the original petition was but Petitioner's second/ successive § 2255 motion, which Petitioner had not received authorization to file, and over which this Court -- being a district court having seat in the district of confinement -- facially lacked jurisdiction). Therefore, the Court dismissed Petitioner's claims articulated in the original petition, and as clarified in that motion, for lack of jurisdiction and, correspondingly, vacated its order directing Respondent's answer. <u>See id.</u> Docket Entry No. 9. However, out of abundance of caution, the Court also directed the Clerk to open the instant matter for Petitioner to ensure that Petitioner has a full and meaningful opportunity to assert the claims over which the Court might have jurisdiction, <u>see id.</u>; such directive was entered in light of the statements made in Petitioner's making cursory references to <u>In re Dorsainvil</u>, 119 F.3d 245, 251 (3d Cir. 1997). <u>See id.</u> Together with directing the Clerk to open the instant matter for Petitioner, the Court also directed Petitioner to file an amended petition asserting only those challenges, if any, that specifically fell within the narrow <u>Dorsainvil</u> exception. <u>See id.</u>

In response, Petitioner filed his amended petition, <u>see</u> Instant Matter, Docket Entry No. 4, and supplemented that filing by an "amendment" striving to add a handful of largely cosmetic changes to Petitioner's discussion of the decisions rendered by various circuit courts (other than the Court of Appeals for the Third Circuit).   <u>See</u> Instant Matter, Docket Entry No. 6.

**B.   SUBSTANTIVE BACKGROUND**

**1.   <u>Petitioner's Conviction</u>**

[Petitioner] was the owner and chief executive officer of Accutel Communications, Inc. ("Accutel").  Accutel would purchase long-distance services at wholesale prices from other long-distance providers.  It would resell the services by engaging in "slamming" and "cramming," in which it switched telephone customers' long distance services to Accutel without the customers' permission (slamming) and then charged the customers a monthly fee for having Accutel as their long-distance provider (cramming).  Accutel generally charged customers an additional $4.95 per month. Accutel's slamming and cramming resulted in millions of dollars of false charges to long-distance customers. Accutel transmitted its charges to customers by providing outside telecommunications consulting companies with billing data.  Those companies would then process the data and wire the reformatted information to a billing agent, which provided the information to local telephone companies for billing. When customers complained to Accutel and the Federal Communication Commission ("FCC"), Accutel falsely told the customers that the change in service was inadvertent, and Accutel provided false records to the FCC.

<u>Soreide v. USA</u>, Civil Action No. 07-cv-60401 (JIC) (S.D. Fl.) ("<u>Soreide-2255</u>"), Docket Entry No. 17, at 4 (Report and Recommendation of Magistrate Judge P.A. White ("Judge White"),

quoting the decision of the United States Court of Appeals in <u>USA</u>
<u>v. Soreide</u>, which affirmed Petitioner's conviction).[1]

---

[1]   A more detailed background was provided by Respondent in
<u>Soreide-2255</u>; that background read as follows:  "On October 1,
2004, . . . [Petitioner's trial] court imposed concurrent
sentences of: 1) 60 months on the mail and wire fraud
conspiracies and substantive counts; 2) 236 months incarceration
on the money laundering; 3) 120 months on the counts of
prohibited money transactions; and 36 months on the tax counts.
The court also imposed three years of supervised release and
directed [Petitioner] to pay restitution in the amount of
$7,603,959.25.  . . .  [Petitioner] was the owner and chief
executive of Accutel . . . , a "switchless reseller" of long
distance telephone services, that is, Accutel had no
telecommunications equipment but was set up to purchase long
distance telephone service from long distance wholesale carriers
and then resell the service to end user customers. [Petitioner],
as the owner and chief executive officer of Accutel, was
responsible for making all business and financial decisions.
Co-defendant Donna Kim-Sottile, who plead guilty prior to trial
and testified against [Petitioner], held a number of corporate
titles including President, Vice President, Vice President of
Operations and Operations Manager, and was primarily responsible
for carrying out [Petitioner's] orders and the day to day
operations of the businesses.  . . .  The vast majority of
long-distance customers billed by Accutel were never recruited by
Accutel.  Instead, Accutel pursued a scheme known . . . as
"slamming" and "cramming" [and] billed its "customers" upwards of
$25 million.  . . .  Accutel . . . also created false records
purporting to document that some complaining customers had
actually agreed to Accutel service, and sent its false
documentation to the FCC and state regulators.  [While
Petitioner] was deceiving long-distance customers, he was also
misleading the telecommunications companies with which he did
business.  Accutel never paid for the bulk of the long distance
services it purchased from the wholesalers.  It paid only
$935,235.95 of $2,172,890.31 it owed the Cable and Wireless
company.  It paid only about $1.94 million of roughly $3.44
million it owed Worldcom, $630,000 of $1.29 million its
successor, NOR, owed Frontier, and virtually nothing -- about
three dollars -- of $1.05 million it owed Sprint.  While
providing assurances to the wholesalers that Accutel would pay
them, [Petitioner] instead diverted Accutel's proceeds into a
variety of personal uses, including a personal home in Boca
Raton, a country club membership, a boat, a pair of office

## 2.   **Petitioner's Post-Conviction Proceedings**

Petitioner appealed his conviction and sentence; the Court of Appeals for the Eleventh Circuit affirmed his conviction, <u>see United States v. Soreide</u>, 177 Fed. App'x 31 (11th Cir. 2006), but remanded for re-sentencing in light of <u>United States v. Booker</u>, 543 U.S. 220 (2005) (since Petitioner's appeal was in "pipeline" when <u>Booker</u> was decided), causing a re-hearing as to Petitioner's sentence; having held such re-hearing, Petitioner's trial court reimposed the same terms of imprisonment, forfeiture and restitution.   <u>See</u> <u>USA v. Soreide</u>, Crim. Acrion No. 03-cr-60235 (JIC) (S.D. Fl.) ("<u>Soreide-Criminal</u>"), Docket Entry No. 319.

On March 22, 2007, Petitioner filed his § 2255 motion.   <u>See id.</u>, Docket Entry No. 311 (reflecting this submission as part of the docket created with regard to Petitioner's criminal action); <u>see also</u> <u>Soreide-2255</u>, Docket Entry No. 1 (reflecting same submission as part of the docket created with regard to Petitioner's § 2255 action).

In his 2255 motion, Petitioner raises thirteen claims, summarized by Judge White as follows:

    1.   [Petitioner] received ineffective assistance of counsel when counsel failed to object to the

_____

buildings, a million-dollar investment in a cruise ship, and more than half a million dollars in cash for his wife.  Accutel then filed for bankruptcy, claiming it had less than $1,000 in assets."  <u>Soreide-2255</u>, Docket Entry No. 12, at 2-4.

Sentencing Guideline used to calculate his
sentence . . . .

2.   [Petitioner] received ineffective assistance of
counsel when counsel failed to object to the
computation of his criminal history . . . .

3.   [Petitioner] received ineffective assistance of
counsel when counsel failed to object to [tax
fraud counts] of the [i]ndictment . . . .

4.   [Petitioner] received ineffective assistance of
counsel when counsel failed to object to the
special verdict form.

5.   [Petitioner] received ineffective assistance of
counsel when counsel failed to object to the
grouping of offenses in the presentence
investigation report.

6.   [Petitioner] received ineffective assistance of
counsel when counsel failed to object to
restitution.

7.   [Petitioner] received ineffective assistance of
counsel when counsel failed to stop the government
from confiscating his assets pursuant to an order
of forfeiture.

8.   [Petitioner] received ineffective assistance of
counsel when counsel failed to contest money
laundering charges [after] the prosecutor advised
the jury that the government [had lost] the
information on the accounting discs and had no
copies of the information.

9.   [Petitioner] received ineffective assistance of
counsel at the resentencing hearing . . . .

10.  There was no proof or testimony that [Petitioner]
had the mens rea to sustain his convictions of
fraud . . .

11.  [Petitioner] received ineffective assistance of
counsel at trial when he was represented by two
attorneys [who conducted examinations and cross-
examinations of different witnesses].

12.  [Petitioner] received ineffective assistance of
counsel when counsel failed to appeal his
conviction and only challenged the sentence
imposed at the original sentencing hearing.[2]

13.  [Petitioner] received ineffective assistance of
counsel when counsel failed to call [certain]
witnesses on his behalf . . . .

---

[2]  In reality, Petitioner's appellate counsel challenged his
conviction as well as his sentence.

6

Soreide-2255, Docket Entry No. 17, at 1-3.

Specifically, stating to his eighth claim (i.e., the claim that his counsel was ineffective for failure to contest money laundering charges in connection with prosecutorial loss of accounting data), see Soreide-2255, Docket Entry No. 1, at 31-34 (covering the entirety of Petitioner's eighth claim), Petitioner asserted, inter alia:

> [Petitioner's beliefs that, in order to support his money laundering conviction, t]here must [have] be[en] some evidence that the funds were "more concealed" [in comparison with the concealment shown by the government. In support of his position, Petitioner relied on] US v. Magluta, 41[8] F.3d 1166 (11th Cir. 2005) [contending that this decision supported Petitioner's § 2255 challenges because] "the Magluta Court" found that the defendant [in that case] went to great length to "cloak the account" in a "v[e]il of secrecy." [Petitioner contended that, in his case, there was no such showing but only] "simple and straight forward banking transactions [involving Petitioner's and Accutel's] accounts. [Since these banking transaction were not "veiled," Petitioner contended that t]he government failed to meet it's burden to prove the requisite intent of conceal [because, in Petitioner's opinion, the government] "presented no evidence of unusual secrecy, questionable structuring, highly irregular features of the transfers, or multiple movements of the same funds that assisted in concealing their original source." [Petitioner, therefore, believed that his conviction was unwarranted because, as one] court made clear[,] . . . . the government must prove that concealment of the money's illicit origin was the [d]efendant's purpose and that is not proved by evidence of concealment alone. [Citing] United States v. Cuellar, 5th Cir., [decision in the Crim. Action] No. 05-10065, [dated] 02-22-2006.

Id. at 33-34.

7

Petitioner's contentions were found meritless by Judge
White, see Soreide-2255, Docket Entry No. 17, and -- after two
rounds of Petitioner's objections to Judge White's recommendation
(see Soreide-2255, Docket Entries Nos. 18 and 19, rehashing, once
again, Petitioner's challenges, including his assertions that the
government was obligated to show "more concealment") --
Petitioner's trial court, after allowing Petitioner to appear in
court for additional testimony as to his position -- adopted
Judge White's recommendations and denied Petitioner § 2255
relief.  See Soreide-2255, Docket Entries Nos. 20 and 21 (writ of
habeas corpus ad testificandum and memorandum order adopting
Judge White's report and recommendations).[3]

### 3.   Petitioner's Instant Claims

In his instant § 2241 action, Petitioner asserts that his
claims are not barred by the gate-keeping provision, and this
Court has jurisdiction to entertain his challenges under the
Dorsainvil exception.  In support of his position, Petitioner
relies on two Supreme Court decisions, Regalado Cuellar v. United
States, 553 U.S. 550 (2008), and United States v. Santos, 553

---

[3]   Petitioner appealed that determination, and -- having his
appeal dismissed by the United States Court of Appeals for the
Eleventh Circuit -- sought certiorari from the United States
Supreme Court, which was denied.  See Soreide v. United States,
129 S. Ct. 2809 (2009).

8

U.S. 507 (2008), <u>see</u> Instant Matter, Docket Entry No. 4,[4] plus a panoply of decisions rendered by various circuit and district courts and irrelevant to this Court's <u>Dorsainvil</u> anaslysis.

Since, as the discussion below illustrates, Petitioner's claims are wholly without merit (indeed, are frivolous), Petitioner's challenges will be dismissed, with prejudice, for lack of jurisdiction.

## II.   <u>DISCUSSION</u>

United States Code Title 28, Section 2243 provides, in relevant part as follows:

> A court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto.[5]

---

[4]   In addition to these two Supreme Court cases, Petitioner also relies on numerous decisions rendered by different courts of appeal, including on <u>United States v. Scialabba</u>, 282 F.3d 475 (7th Cir. 2002).  <u>See</u> <u>generally</u>, Docket Entries No. 4 and 6.

[5]   In light of Petitioner's challenges being based on: (a) decisions rendered by the Supreme Court; and (b) assertions made in the submissions actually entered in the record of Petitioner's criminal and § 2255 proceedings (available via PACER), this Court need not direct Respondent's answer in order to address the merits of Petitioner's position.  Federal Rules of Evidence permit a district court to take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Rule 201(b); <u>see</u> <u>In re NAHC Sec. Litig.</u>, 306 F.3d 1314, 1331 (3d Cir. 2002).

A.    THE SCOPE OF THE *DORSAINVIL* EXCEPTION

As noted by the Court of Appeals for the Third Circuit in
Dorsainvil, 119 F.3d at 249, a motion to vacate, set aside, or
correct sentence under 28 U.S.C. § 2255 has been the "usual
avenue" for federal prisoners seeking to challenge the legality
of their confinement.  See also Okereke v. United States, 307
F.3d 117, 120 (3d Cir. 2002); Chambers v. United States, 106 F.3d
472, 474 (2d Cir. 1997); Wright v. United States Bd. of Parole,
557 F.2d 74, 77 (6th Cir. 1977); United States v. Walker, 980 F.
Supp. 144, 145-46 (E.D. Pa. 1997) (challenges to a sentence as
imposed should be brought under § 2255, while challenges to the
manner in which a sentence is executed should be brought under §
2241).

Motions under § 2255 must be brought before the Court which
imposed the sentence.  See 28 U.S.C. § 2255.  A one-year period
of limitations applies to § 2255 motions.  See 28 U.S.C. §
2255(f).  A second or successive motion under § 2255 cannot be
filed without prior authorization by the circuit court having
geographical jurisdiction over the district court of conviction.
See 28 U.S.C. § 2255.

Section 2255, however, contains a safety valve permitting
resort to § 2241, "the original writ" statute containing no
timeliness or successive petition limitations: such resort is
allowed where "it appears that the remedy by [§ usual 2255]

10

motion is inadequate or ineffective to test the legality of [the prisoner's] detention."  See 28 U.S.C. § 2255(e).  In Dorsainvil, the Court of Appeals held that the remedy provided by § 2255 is "inadequate or ineffective" where a prisoner (who previously had filed a § 2255 motion on other grounds) "had no earlier opportunity to challenge his conviction for a crime that an intervening change in substantive law may negate."  119 F.3d at 251.  The court emphasized, however, that its holding was not intended to suggest that § 2255 would be considered "inadequate or ineffective" merely because a petitioner is unable to meet the stringent gate-keeping requirements of § 2255.  See id.  To the contrary, the court was persuaded that § 2255 was "inadequate or ineffective" in the unusual circumstances presented in Dorsainvil, i.e., where an intervening interpretation of the statute of conviction *by the United States Supreme Court* rendered the conduct underlying the prisoner's incarceration not criminal conduct at all.  See id. at 251-52.  In Cradle v. Miner, 290 F.3d 536 (3d Cir. 2002), the Court of Appeals emphasized the narrowness of  the "inadequate or ineffective" exception by pointing out that a § 2255 motion is "inadequate or ineffective," authorizing resort to § 2241, "only where the petitioner demonstrates that some limitation of scope or procedure would prevent a § 2255 proceeding from affording him a full hearing and adjudication of his wrongful detention claim."  Cradle, 290 F.3d

11

at 538. "It is the inefficacy of the remedy, not the personal inability to use it, that is determinative." Id. "Section 2255 is not 'inadequate or ineffective' merely because the sentencing court does not grant relief, the one-year statute of limitations has expired, or the petitioner is unable to meet the stringent gate-keeping requirements of the amended § 2255. The provision exists to ensure that petitioners have a fair opportunity to seek collateral relief, not to enable them to evade procedural requirements." Id. at 539.

This narrow reading of Dorsainvil has been faithfully applied by the district courts in this Circuit and consistently reiterated by the Court of Appeals.

> Federal prisoners challenging the validity of their sentences generally must do so by means of a § 2255 motion in the sentencing court . . . . See 28 U.S.C. § 2255(e); Cradle, 290 F.3d at 538. We have recognized a narrow exception permitting resort to § 2241 by "a prisoner who had no earlier opportunity to challenge his conviction for a crime that an intervening change in substantive law may negate[.]" In re Dorsainvil, 119 F.3d [at] 251 . . . . In Dorsainvil, we permitted resort to § 2241 because the Supreme Court's decision in Bailey v. United States, 516 U.S. 137 (1995), rendered after Dorsainvil already had filed a § 2255 motion, interpreted his statute of conviction in a way that suggested he might be "imprisoned for conduct that the Supreme Court has determined is not illegal." Id. at 247. We emphasized that the exception was a "narrow" one reserved for prisoner's in Dorsainvil's "uncommon" situation. Id. at 248. We have never squarely addressed whether a Dorsainvil-like challenge can be brought under § 2241 within the district of confinement where, as here, the petitioner was convicted in a different district. Cf. In re Nwanze, 242 F.3d 521, 524-27 (3d Cir. 2001) (noting that the district of conviction and confinement were the same in

12

> <u>Dorsainvil</u> and declining to issue writ of mandamus to
> prevent transfer of a § 2241 petition to the district
> of conviction within the Fourth Circuit).  We need not
> address that issue in [a] case [where the prisoner's]
> challenge does not fit within <u>Dorsainvil</u> and thus
> cannot be asserted under § 2241 in the first place.

<u>Cusano v. United States</u>, 2010 U.S. App. LEXIS 15362, at *3-4 and

n.2 (3d Cir. N.J. July 26, 2010).

### B.   THE PETITION FAILS TO MEET THE *DORSAINVIL* EXCEPTION

#### 1.   Petitioner's Challenges Based on *Cuellar*

The first of the two lines of Petitioner's assertions that

he meets the <u>Dorsainvil</u> exception (and, thus, that this Court has

§ 2241 jurisdiction to entertain his claims) is based the Supreme

Court's decision in <u>Regalado Cuellar v. United States</u>, 553 U.S.

550.  Specifically, Petitioner asserts:

> The facts are that Petitioner provided all checks, bank
> cashier checks, wire transfers and bank statements to
> the Government of which not one was missing.  The
> government state[d] in it's [sic] closing arguments
> [that,] "[Petitioner's] transactions involved
> [conversion into] cash, in every instance except_one,
> [with] money [then] transfer[r]ed over to 150 Sample
> Realty.  Why is it concealment?  Once that money goes
> into cash who knows where it goes.  It could be spent
> on anything the defendant wants.  [Once h]e has
> converted 'proceeds' into cash, it is in the wind.
> There is no way of following it after that."  Further,
> government state[d] in it's response to [P]etitioner's
> §2255 motion  [that] "The concealment counts were based
> on [Petitioner's] converting Accutel revenues into
> thousands of dollars in cash, making the funds
> impossible to track."  Here we have simple and straight
> forward banking transactions, easily discovered through
> a cursory review of [Petitioner's and Accutel's]
> accounts.  There was no evidence of unusual secrecy,
> questionable structuring, highly irregular features of
> transfers, or multiple movements of the same funds . .
> . .

> . . .
> In accordance with the United States Supreme Court's
> interpretation of the federal money laundering statute,
> . . . "the government must prove, the intent, to
> conceal or disguise the nature, the location, the
> source, the ownership, or the control" of the money.  .
> . .  The government did not during trial, it's [sic]
> closing arguments, or in it's [sic] response to
> petitioner's §2255 motion, prove as it must, and as
> required by [Cuellar], [P]etitioner's intent, "to
> conceal or disg[u]ise the nature, the location, the
> source, the ownership, or the control" of the money.  .
> . .  In light of Cuellar, Petitioner has proved his
> actual innocence.

Instant Matter, Docket Entry No. 4, at 12-13.

Contrary to Petitioner's assertion, the holding of Cuellar

establishes that Petitioner's instant Petition is, indeed, a

second/successive § 2255 application fostered in the wrong forum

and, in addition, without obtaining due leave from the Court of

Appeals for the Eleventh Circuit.[6]

In Cuellar, defendant was traveling toward Mexico when he

was stopped by police.  Because the cash that defendant had

removed from his pocket had the distinct smell of like marijuana,

defendant's car was searched, and bundles of cash were found

under the floorboards of the car.  The government's case

---

[6]  Petitioner concedes that he sought leave to file
second/successive § 2255 petition from the Eleventh Circuit, but
such application was denied.  See Instant Matter, Docket Entry
No. 4, at 7 (clarifying that such denial was entered on July 15,
2009, that is, on the same day when the Supreme Court denied
Petitioner certiorari with regard to his appeal as to the
Eleventh Circuit's affirmance of the Southern District of
Florida dismissal of Petitioner's § 2255 challenges: both these
decisions were entered five months prior to Petitioner's
initiation of his § 2241 Soreide-I action in this District).

14

consisted solely of the testimony from the arresting officers and from an expert who stated that the money was wrapped in a way that was typical of drug traffickers in transporting money across the border. The United States District Court for the Northern District of Texas convicted defendant, finding the evidence sufficient to meet all elements of the money laundering statute. A panel of the Court of Appeals for the Fifth Circuit reversed the judgment of conviction and rendered a judgment of acquittal. See United States v. Cuellar ("Cuellar-Panel"), 441 F.3d 329 (5th Cir. 2006) (decided on Feb. 22, 2006). The panel held that the district court should have granted defendant's motion for judgment of acquittal because the evidence was insufficient to support one of the elements of the statute, i.e., the element requiring a showing that the defendant was executing the very transaction at issue (which, in the context of Cuellar, meant the act of driving over the United States-Mexico border) with intent to conceal the illegal nature of the money (or its illegal source). See id. Distinguishing the act of hiding cash under the floorboards of the car (since such action could be undertaken within the United States' borders for a number of purposes having no relation to an attempt to conceal the illegally obtained funds in Mexico) from the distinct act of driving over U.S.-Mexico border (which was the sole transaction underlying the money laundering charge in Cuellar), the panel observed that the mere

15

act of hiding cash in the car failed to establish concealment for the purposes of driving over the border.  See id.  *It is on this very decision Petitioner relied, as the governing law, in his § 2255 motion*.  See Soreide-2255, Docket Entry No. 1, at 33-34 (also relying, as governing law, on US v. Magluta, 418 F.3d 1166).[7]

On June 30, 2006, the Fifth Circuit granted the United States's application for rehearing en banc.  See United States v. Cuellar, 454 F.3d 505 (5th Cir. 2006).  Consequently, one year from the entry of Cuellar-Panel, on rehearing en banc, the majority's decision reversed the panel's decision by affirming the Cuellar defendant's conviction.  See United States v. Cuellar ("Cuellar-En Banc"), 478 F.3d 282 (5th Cir. 2007) (with fifteen judges joining with Davis, J. in reversal, and only Smith, Demoss and Dennis, JJ., dissenting).  The majority in Cuellar-En Banc held that the evidence was sufficient to prove that the Cuellar

---

[7]  The standard imposed upon the government by Magluta was even stricter than that imposed by the Fifth Circuit panel in Cuellar-Panel.  In Magluta, the Eleventh Circuit observed that, "[t]o prove that [defendant] engaged in money laundering . . . , the government ha[s] to establish that: (1) [defendant] conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily specified unlawful activity; (3) [defendant] knew the proceeds were from some form of illegal activity; and (4) [defendant] *knew a purpose of the **transaction** [at issue] was to conceal or disguise* the nature, location, source, ownership, or control of the proceeds."  See Magluta, 418 F.3d at 1173, n. 2 (citing United States v. Majors, 196 F.3d 1206, 1212 (11th Cir. 1999), and 18 U.S.C. §§ 1956(c)(7)(B)(i) & (A), 1961(1)) (emphasis supplied).

defendant knew that his transportation of money was designed to
conceal the illegal nature and location of the cash, merging the
act of concealment in the car with the act of driving over the
U.S.-Mexico border.  See id.

Eight months later, the Supreme Court granted the Cuellar
defendant certiorari, see Cuellar v. United States, 552 U.S. 973
(2007), and on June 2, 2008, Justice Alito delivered the
unanimous opinion of the Court, see Cuellar, 553 U.S. 550
("Cuellar-S. Ct."), reinstating and validating *the very same
legal standard* that was: (a) articulated in Cuellar-Panel; and
(b) presented by Petitioner to his sentencing court (and, later,
to the Court of Appeals for the Eleventh Circuit) during
Petitioner's § 2255 proceedings.  Simply put, Petitioner's
argument based on Cuellar-S. Ct. was indeed presented to -- and
rejected on the merits -- during Petitioner's § 2255 proceedings:
because Cuellar-Panel and Cuellar-S. Ct. present the very legal
standard.

In short, Petitioner alleges now the very same Cuellar claim
that Petitioner *already actually presented* during his § 2255
proceedings (and which Petitioner's sentencing court rejected),
while simultaneously maintaining that this Court has § 2241
jurisdiction over his claims, under Dorsainvil, because
Petitioner *could not present* this very claim during his § 2255
proceedings.  While the Court, being mindful of Petitioner's pro

17

se status, grants Petitioner the benefit of the doubt and presumes that Petitioner, regardless of submitting an extensive discussion of law for this Court's consideration, failed to realize the facial self-contradiction of his position (and, hence, Petitioner's advancement of such position should not warrant sanctions), this Court cannot find that § 2255 was "inadequate or ineffective" remedy to entertain Petitioner's Cuellar claim.  Since the instant application expresses nothing but Petitioner's disappointment with the fact that Petitioner's sentencing court decided not to grant him the requested relief, such disappointment cannot enable Petitioner to evade procedural requirements.[8]  See Cradle, 290 F.3d at 539.

---

[8]  While the substance of Petitioner's Cuellar claim need not be reached by this Court, the Court notes, in passing, Petitioner's undue conflation of: (a) Petitioner's concealment efforts, reflected by his transfer of illegally obtained funds into legitimate bank accounts, real estate business, property, etc., and (b) Petitioner's inability to engage in concealment transactions that would be so complex to successfully deceive. Indeed, a "successful deceit," by definition, succeeds at its aim: avoiding prosecution.  Conversely, a real estate transaction in which the source of the funds or the identity of the owner becomes obscure can support an inference of a design to conceal. See United States v. Turner, 975 F.2d 490, 496-97 (8th Cir. 1992).  Similarly, placing property in another's name can help to substantiate an inference of intent to conceal.  See United States v. Kaufmann, 985 F.2d 884, 894-95 (7th Cir. 1993). Analogously, depositing illegal profits in the bank account of a legitimate business is probative of an intent to conceal.  See United States v. Garcia-Emanuel, 14 F.3d 1469, 1474 (10th Cir. 1994).  Here, too, Petitioner had been channeling illegally obtained funds into accounts and businesses having imprimatur of legitimacy or registered to his wife.  See, e.g., United States v. Soreide, 461 F.3d 1351 (11th Cir. 2006).

### 2. Petitioner's Challenges Based on *Santos*

#### a. Petitioner's Allegations

With regard to his second line of challenges, Petitioner alleges as follows:

> United States v. Santos, affirmed the decision in[]
> Santos v. United States, 416 F.3d 886(7th Cir. 2006)[,]
> w[h]ere the district court vacated the money laundering
> conviction on the basis of the decision in United
> States v. Scialabba, 228 F.3d 475 (7th Cir. 2002),
> which defined "[p]roceeds["] to mean net income, as
> opposed to gross income.  The court held that Santos
> and Diaz were actually innocent of the crime of
> 'Promotional' money laundering.  Scialabba, however,
> ruled that such transactions, which constituted the
> payment of the enterprise's operating expenses out of
> it's [sic] gross income, could not support the
> defendant's money laundering convictions, and reasoned
> that the [petitioners there] were convicted of ["]acts
> that are not now, nor ever have been crimes[."]  The
> government's theory that [P]etitioner violated [the
> money laundering statute] by simply paying business
> operating expenses out of ["]Proceeds["] as the
> indictment charges, which is clearly defined by Santos
> as ["]profits[,"] not receipts, is wrong.  Petitioner
> paid all business expenses from "gross income["] and
> not out of ["]profits["] as evidenced by [P]etitioner's
> business filing Chapter 7 Bankruptcy.

Instant Matter, Docket Entry No. 4, at 14.[9]

Petitioner's Santos contentions are without merit.

#### b. The Rationale and Application of Santos

---

[9]  Petitioner also challenges jury instructions provided by
his sentencing court.  See Instant Matter, Docket Entry No. 4, at
15.  However, the validity of jury instructions is not subject of
§ 2241 review and, a fortiori, this issue has nothing to do with
the Dorsainvil exception concerning itself with whether the
actions underlying the litigant's conviction are no longer deemed
criminal in light of the later Supreme Court precedent.

Three months ago, the Court of Appeals for the Third Circuit
was presented with a set of contentions identical to those
advanced by Petitioner in this matter.  See Abuhouran v.
Grondolsky ("Abuhouran-Appellate"), 2010 U.S. App. LEXIS 17883
(3d Cir. Aug. 25, 2010) (affirming the decision in Abuhouran v.
Grondolsky ("Abuhouran-District"), 643 F. Supp. 2d 654 (D.N.J.
2009)).  Therefore, the legal discussion in the Abuhouran-
District decision appears highly relevant to this Court's
analysis.  Describing the gist of Santos, the Abuhouran-District
court observed:

> The facts of Santos are important when deciding its
> impact upon [this type of] case[s].  From the 1970s
> until 1994, Santos operated a lottery in Indiana that
> was illegal under state law.  Santos hired helpers to
> run the lottery.  At bars and restaurants his runners
> gathered bets from gamblers, kept a portion of the bets
> as their commissions, and delivered the rest to
> Santos's collectors.  The collectors delivered the
> money to Santos, who used some of it to pay the
> salaries of the collectors and to pay the winners.
> [Only these] payments to the runners, collectors and
> winners were the basis of [Santos'] indictment . . . .
> A jury found Santos guilty [and the] Court of Appeals
> for the Seventh Circuit affirmed the conviction[,] . .
> . and the Supreme Court declined to review.  [However,
> during] Santos's 28 U.S.C. § 2255 collateral attack . .
> . , the District Court held that the federal
> money-laundering statute's prohibition of transactions
> involving criminal "proceeds" applies only to
> transactions involving criminal profits, not criminal
> receipts.  Applying this holding to Santos's case, the
> district court found no evidence that the [particular]
> transactions on which the money laundering convictions
> were based ([i.e.,] Santos's payments to runners,
> collectors and winners) involved profits, as opposed to
> receipts of the illegal lottery.  The court vacated the
> money laundering conviction, and the Court of Appeals
> affirmed.  The government's appeal to the Supreme Court

20

produced four opinions.  In what will be referred to
as the "plurality" opinion, Justice Scalia held that,
"[b]ecause the 'profits' definition of 'proceeds' is
always more defendant friendly than the 'receipts'
definition, the rule of lenity dictates that it should
be adopted." Santos, 128 S. Ct. at 2025. . . .  In an
opinion concurring in the judgment resulting from
Justice Scalia's opinion, Justice Stevens . . .
concluded that "[t]he revenue generated by a gambling
business that is used to pay the essential expenses of
operating that business is not 'proceeds' within the
meaning of the money laundering statute." Id. at 2033.

Abuhouran-District, 643 F. Supp. 2d at 659-60.

Then, turning to the Court of Appeals' reflections on

Santos, the court in Abuhouran-District pointed out that

[t]he Court of Appeals for the Third Circuit had
occasion to refer to Santos in United States v. Yusuf,
536 F.3d 178 (3d Cir. 2008).  The issue in that case
was whether unpaid taxes, which were unlawfully
disguised and retained by means of the filing of false
tax returns through the United States mail, were
"proceeds" of mail fraud for purposes of sufficiently
stating a money laundering offense under the . . .
money laundering statute . . . .  Mail fraud was the
specified unlawful activity to support the money
laundering charges against the defendants, who moved in
the District Court to dismiss the substantive money
laundering charges on the basis that any imposed taxes
disguised and retained as a result of filing false tax
returns through the mail [did] not equate to "proceeds"
of mail fraud.  The District Court agreed and dismissed
the substantive money laundering counts. . . .
Applying Santos, the Court of Appeals ruled:

. . . the mailings of the fraudulent tax returns
resulted in "proceeds" of mail fraud based on the
nature of the entire ongoing fraudulent scheme
because the unpaid taxes unlawfully retained by
defendants represented the "proceeds" of a fraud
that was also furthered by previous mailings. See
Morelli, 169 F.3d at 806-807.  Each mailing,
whether it occurred before or after a given act of
tax fraud, served to promote and conceal each
month's unlawful retention of taxes, either ex

21

ante or ex post, and made it more difficult for
the government to detect the entire fraudulent
scheme.  See id.  Moreover, each mailing of the
fraudulent tax forms "contributed directly to the
duping" of the Virgin Islands government, and
subsequent mailings were essential to keep
defendants' scheme going because it would have
come to an end if the tax collecting authorities
did not continue to receive these mailings.  See
Schmuck, 489 U.S. at 712.  Accordingly, it
logically follows that the unpaid taxes,
unlawfully disguised and retained through the
mailing of the tax forms, were "proceeds" of
defendants' overall scheme to defraud the
government.  This scheme was both dependent on and
completed by the monthly mailing of the false
Virgin Islands gross receipt tax returns.
Finally, in light of the Supreme Court's decision
in Santos, we recognize that the "proceeds" from
the mail fraud in this case also amount to
"profits" of mail fraud.  See 128 S. Ct. [at]
2025.  By intentionally misrepresenting the total
amount of Plaza Extra Supermarkets' gross receipts
through the mailing of fraudulent tax returns, the
defendants were able to secretly "pocket" the 4%
gross receipts taxes on the unreported amounts
which were the property of the Virgin Islands
government.  .  .  .  Other than some small expenses
incurred in perpetuating the mail fraud - i.e.,
the postage stamp affixed to their monthly tax
return or any other preparation fees relating to
the return - the unpaid taxes retained by
defendants amounted to profits.  Once these
profits were included in the [unrelated to the
needs of the bank fraud transaction when a] lump
sums sent abroad by defendants, the offense of
international money laundering was complete.

   Id. at 190.

Abuhouran-District, 643 F. Supp. 2d at 660-61.

   However, recognizing that the aforesaid analysis would ring

hollow without a clear understanding of how "proceeds" differ

from "profits," and when these two concepts merge, the court in

<u>Abuhouran-District</u> pointed out that

> <u>Yusuf</u> is readily distinguishable from <u>Santos</u> and
> <u>Scialabba</u>.  In the latter two cases the proceeds
> involved in the money laundering transactions were paid
> out [for the purposes of] the commission of the
> predicate offense . . . .  In <u>Yusuf</u>, the proceeds
> involved in the money laundering were the fruits of a
> completed predicate offense . . . paid . . . "to
> conceal or disguise the nature, the location, the
> source, the ownership, or the control of the proceeds
> of" the predicate offense.  . . .  In theory[,] . . .
> there [could be three scenarios, first being] pure
> money laundering, exemplified by <u>Yusuf</u>, [where] the
> specified unlawful activity is carried out [wholly]
> independently of the money laundering transactions.
> Second, there [could be] "false money laundering,"
> exemplified by <u>Santos</u> and <u>Scialabba</u>, [where] the
> alleged money laundering transaction [also the]
> specified unlawful activity.  Third, there [could be a]
> merger case [where] the specified unlawful activity is
> carried out independently of the money laundering
> transaction, [but] the two are . . . interrelated.

<u>Id.</u> at 665-67.

   Noting that any merger case is fact sensitive in terms of

whether it should be brought within the holdings of <u>Santos</u>/

<u>Scialabba</u> or that of <u>Yusuf</u>, the court in <u>Abuhouran-District</u>

concluded that

> [t]here is a world of difference between the <u>Santos</u>
> situation and the situation [in <u>Abuhouran</u> since, in the
> latter, petitioners,] through their manifold fraudulent
> acts, secured each loan [and, at that point,] the
> specified unlawful activity, [<u>i.e.</u>,] bank fraud, was
> completed. *Whatever was done with the proceeds of each
> loan was the start of a new activity* [that involved
> concealment of these fraudulently obtained funds by
> purchasing a building, channeling funds into the
> petitioner's construction company and paying expenses
> associated with running that construction business.
> However, the <u>Abuhouran</u> petitioners do not come within

23

the merger scenario[s allowing an analogy to Santos/
Scialabba since not all the] payments [charged against
the Abuhouran petitioners and those on the grounds of
which the Abuhouran petitioners were convicted] were .
. . "costs of a crime" [i.e., the costs of executing]
the crime of bank fraud.  They were . . . payments
[associated with] *disposing of the fruits of the crime*.
. . .  [T]he proceeds of the bank frauds were *profits*
and [the petitioner's disposal of these profits for
purposes other than to conduct their bank fraud was] a
proper basis for the money laundering charges on which
[they] were convicted.  This conclusion is not affected
by the merger concept [resulting from the unique facts
and carefully tailored holding of] Santos.

Id. at 669-74 (emphasis supplied).

The Court of Appeals affirmed, summarizing:

[the Abuhouran petitioners maintain that] the
transactions charged as money laundering were expenses
of the bank frauds and not profits, and thus under
Santos, they are actually innocent of money laundering.
. . .
The crux of [their] argument . . . is that the
transactions charged as money laundering [were]
expenses of [their] bank frauds, not profits from the
bank frauds.  [However, a] comparison with the facts of
Santos emphasizes the deficiencies in [their] argument.
In Santos, the transactions charged as money laundering
were [the very acts of making] payments to the
individuals who helped run the illegal lottery and
payments to lottery winners.  128 S. Ct. at 2022-23.
[Here, the petitioners] *have not explained how the
transactions charged as money laundering in their case*
[i.e., their buying real estate property and their
making payments with regard to their construction
business in doomed attempts to save it from bankruptcy]
*were payments that were integral to* [their] *bank fraud
scheme*.  Accordingly, [they] are not actually innocent
of money laundering under Santos . . . .

Abuhouran-Appellate, 2010 U.S. App. LEXIS 17883, at *8-10

(emphasis supplied).

In other words, a litigant aiming to bring his/her claims under <u>Santos</u> must allege facts showing that his/her money laundering charges (and conviction) was based *only* on the transactions executed by the litigant for the purposes integral to his/her execution of the underlying illegal activity, <u>e.g.</u>, on the payments of the costs necessitated by running that particular underlying illegal "business."   <u>See</u> <u>id.</u>

   c.   **Petitioner's Money Laundering Transactions**

   The list of money laundering transactions charged against Petitioner, as well as the list of the additional transactions that came to light during Petitioner's prosecution and served as bases for Petitioner's conviction on money laundering grounds are extensive.   Specifically, Petitioner's indictment, noting such transactions as cash withdrawals from Accutel account in the amounts of $10,000, $7,000, $25,000 and another $10,000 (on October 27 and December 9, 1998, and March 9 and 11 of 1999, respectively), <u>see</u> <u>Soreide-Criminal</u>, Docket Entry No. 3, at 16, proceeded to listing the following transactions (under the sub-heading "Financial Transactions with Criminally Derived Property"): (a) transfer of $50,015 to American Viking Lines Limited Corporation ("Viking Lines," a cruise line not associated with the "slamming" and "cramming" business of Accutel) on October 8, 1998; (b) transfer of $10,015 to the Viking Lines on October 20, 1998; (c) transfer of $25,015 to the Viking Lines on

25

November 2, 1998; (d) transfer of $450,015 to the Viking Lines on November 3, 1998; (e) transfer of $12,015 to Creative Design and Marketing ("Design," an entity not associated with business fraud of Accutel) on November 23, 1998; (f) transfer of $40,000 to Lynn Soreide, Petitioner's wife ("Lynn," who never worked at Accutel) on November 23, 1998; (g) transfer of $10,015 to the Viking Lines on November 24, 1998; (h) transfer of $13,004.70 to Florida Bond and Mortgage Incorporated on November 25, 1998; (i) transfer of $53,015 to the Design on November 23, 1998; (j) transfer of $50,015 to the Viking Lines on December 9, 1998; (k) transfer of $60,000 to Lynn on January 4, 1999; (l) transfer of $15,015 to a certain J. Putlic (person not associated with Accutel's fraudulent business) on January 8, 1999; (m) transfer of $10,015 to Oconto Real Estate ("Real Estate I," an entity not associated with the "slamming" and "cramming" business of Accutel) on January 28, 1999; (n) transfer of $20,000 to Sample Realty Inc. ("Real Estate II," an entity not associated with the "slamming" and "cramming" business of Accutel) on March 12, 1999; (o) transfer of $20,000 to Lynn on March 18, 1999; (p) transfer of $15,015 to Real Estate I on April 6, 1999; (q) transfer of $20,000 to Lynn on April 7, 1999; (r) transfer of $15,015 to Real Estate II on April 8, 1999; (s) transfer of $10,012.50 to Real Estate I on April 16, 1999; (t) transfer of $20,000 to Multimedia Entertainment of America (an entity not associated with the

26

"slamming" and "cramming" business of Accutel) on July 1, 1999;
(u) transfer of $20,000 to Real Estate II on July 1, 1999; (v)
transfer of $30,000 to Lynn on July 16, 1999; and (w) transfer of
$15,000 to Lynn on August 5, 1999.  See id. at 18-20.

Moreover, Petitioner was charged, convicted and sentenced in
connections with the transactions that also gave rise to
forfeiture of his and Lynn's property; the circumstances of this
leading-to-forfeiture cluster of transactions were detailed (in
connection with Petitioner and Lynn's attempts to preserve their
ownership in illegally obtained properties) as follows:

> On September 21, 2004, the [c]ourt [in Soreide-
> Criminal] entered an order . . . forfeiting to the
> United States [Petitioner's] interest in 195 Alexander
> Palm Road, Boca Raton, Florida, and entering a money
> judgment in the amount of $7.5 million which represents
> property involved in the money laundering violations or
> property traceable to such property.  On September 30,
> 2004, [that c]ourt [added to forfeiture] the proceeds
> of the sale of a Days Inn and Suites hotel located at
> 510 Lane Avenue South, Jacksonville, Florida.  On
> December 1, 2004, [that c]ourt entered [added also] the
> proceeds from the sale of the property located at 550
> SE 9th Street and any accrued interest.   [Lynn]
> admitted that she was not employed . . . and any source
> of income that she had would have been generated by
> [Petitioner.  Lynn] admitted that she did not work at
> Accutel.  The money [Lynn] received from Accutel was an
> owner's draw, that is money that was disbursed to her
> as owner.  [Lynn] admitted that the main reason Accutel
> was put in her name was to protect the business from
> being taken by the government . . . and that she did
> not invest any of her own money in Accutel. [Lynn]
> stated that the first time she received a salary since
> moving to Florida [in 1990] was in July 2004 [when she
> began working at a] hotel in Jacksonville, after
> [Petitioner,] her husband[,] was convicted.  [Lynn]
> admitted that the source of her money was money from
> Accutel . . . .

[As to the property known as] 195 Alexander Palm Road, Boca Raton, Florida ("the residence [of Petitioner and Lynn") [Lynn] admitted that the residence was purchased through Accutel. [To obtain that property, t]here was $700,000.00 deposit[ed, plus] $52,848.30 [paid also in cash, with all these funds being obtained as a result] withdrawal authorization from Accutel account . . . signed by [Petitioner]. The remaining purchase price was financed. [Lynn then] used money from Accutel and an equity loan on the residence to pay the mortgage on the residence.

[As to the property known as] 550 SE 9th Street, Delray Beach, Florida, [Lynn] admitted that she used money from her Smith Barney Brokerage account to purchase [that property] and that the deposits into the account were made from Accutel. On or about July 21, 1997, $10,000.00 was deposited into [Lynn's] Smith Barney brokerage account . . . . On July 16, 1998, $200,000.00 was deposited into [that] brokerage account from Accutel Citibank account . . . . [Lynn] admitted that the only deposits, other than Accutel deposits, into the account, between the time of the initial deposits and the time that the property was purchased was [the] accumulated interest. On January 19, 2000, $42,218.73 was withdrawn from [that] brokerage account in the form of a check made payable to Nations Bank. Nations Bank [then] issued cashiers check . . . in the amount of $42,218.73, payable to Lynn[, and this] check was used for the purchase of the property. [Lynn] paid the mortgage on the property from the equity loan on the residence. The property was sold in August 2004 for $975,000.00[, so Lynn and Petitioner] netted $144,012.41.

[As to the properties known as] 100 and 150 Sample Road, [Lynn] admitted that the properties were purchased with money from Accutel. [In order to so purchase,]$50,000.00 deposit [was made, together with] $186,263.69 and $186,673.29 [additional payments made, respectively to each piece of property]. The following Accutel monies were used to purchase the property: checks . . . signed by [Petitioner], each check for $50,000.00 [plus a transfer of] $400,000.00 from Accutel . . . .

[As to the property known as] 195 Days Inn and Suites Hotel [located at] 510 Land Avenue South and [a vacant adjacent lot located at 540 Lane Avenue South, [Lynn] identified the following sources . . . : [m]oney from the sale of 100 Sample Road and 150 Sample Road

28

[and]  the equity in the Delray Beach property . . . in
the amount of $650,000.00 . . . .  [Lynn] paid the
mortgages on the hotel from the business at the hotel.
[Lynn] paid $200,000.00 for the vacant land . . . and
paid the mortgage on the vacant land out of the hotel
business account.[10]

Soreide-Criminal, Docket Entry No. 207, at 2-7 (citations to

stipulations, court orders and Lynn's depositions entered into

the record omitted).

### d.  Petitioner's Santos Contentions Are Frivolous

As explained supra, any prosecutorial charge made with

regard to a transaction that is not integral to the underlying

illegal business (i.e., not a cost necessitated by the need to

conduct that particular illegal activity) is a transaction

falling outside the reach of Santos and, hence, supporting a

conviction for money laundering.  See Abuhouran-Appellate, 2010

U.S. App. LEXIS 17883, at *8-10.  Moreover, in order to succeed

at showing money laundering, it is enough for prosecutors to

charge just one such transaction unrelated to the needs of the

underlying illegal activity.  See Abuhouran-District, 643 F.

Supp. 2d at 673  ("to establish . . . the "profits" . . . , the

prosecution needs to show only that a single instance of

specified unlawful activity was profitable and gave rise to the

_____

[10]  While the issues addressed in this sub-chapter of the
Opinion focus on Petitioner's Santos-based challenges, the Court
notes, in passing, that the elaborate scheme employed by
Petitioner and his wife in order to conceal the illegal funds
renders Petitioner's substantive claim under Cuellar-S. Ct.
puzzling at best, if not frivolous.  Accord this Opinion, note 8.

money involved in a charged transaction [unrelated to the needs
of that specified unlawful activity]. And the government, of
course, can select the instances for which the profitability is
clearest. . . . [T]he fact finder will not need to consider
gains, expenses, and losses attributable to other instances of
specified unlawful activity, which goes to the profitability of
[the] entire criminal enterprise") (quoting <u>Santos</u>, 128 S. Ct. at
2029).

Since, here, the underlying illegal activity consisted of
Accutel's (<u>i.e.</u>, Petitioner's) "slamming" and "cramming" of the
subscribers of telephone long distance services, the only
transactions integral to *that* activity entailed costs associated
with Accutel/Petitioner's need to create false records
(purporting to document that some complaining customers had
actually agreed to Accutel service), with the need to send these
false documentations to the FCC and to state regulators, with the
need to mislead the telecommunications companies actually
providing long-distance phone services (by deceiving these
companies into believing that Petitioner intended to eventually
pay them for the services these companies had provided), and
akin. In contrast, neither channeling hundreds of thousands of
dollars to Lynn, nor purchasing a luxury residence for Petitioner
and Lynn, nor investing money in Real Estate I and/or Real Estate
II, nor buying a hotel, or a vacant lot, or transferring funds to

30

the Viking Lines, and akin -- none of these transactions were
necessitated by Accutel's business of "slamming" and "cramming"
of the subscribers of telephone long-distance services.
Therefore, all such transactions were properly identified by
Petitioner's prosecutors as bases for his money laundering
charges,[11] and the holding of <u>Santos</u> could not have had any
effect on the validity of Petitioner's conviction.   <u>See</u>
<u>Abuhouran-Appellate</u>, 2010 U.S. App. LEXIS 17883, at *10.

     Since Petitioner's activities cannot be defined as "rendered
not criminal" by the Supreme Court's decision in <u>Santos</u>,
Petitioner's challenges, correspondingly, cannot fall within the
narrow scope of the <u>Dorsainvil</u> exception.   Consequently,
Petitioner cannot bypass the gatekeeping requirements, and this
Court has no § 2241 jurisdiction over his instant Petition: the
Petition presents noting but a second/successive § 2255

---

     [11]   Since Petitioner: (a) has, presumably, been made aware
of the charges in his indictment and of the transactions
underlying his conviction and forfeiture of his property; (b) is,
undoubtedly, aware of all those situations when he issued Accutel
checks to Lynn, wired Accutel's funds to Lynn or took Accutel's
cash for deposit on Lynn's accounts; and (c) adamantly insisted,
in connection with the forfeiture judgment, that the residence,
hotel, and other real estate were his and Lynn's purchased from
Accutel's illegal profits, it appears certain that Petitioner
knew that these transactions actually took place and were the
basis for his indictment and conviction.   Yet, in this action, he
asserts that the prosecutors only charged him with transactions
that were "pay[ments of] business operating expenses."   <u>See</u>
Instant Matter, Docket Entry No. 4, at 15.   Such assertions
suggest that Petitioner's application at bar is frivolous and
causes the Court grave concern as to Petitioner's veracity.

application filed with the wrong district court and without the required leave from the United States Court of Appeals for the Eleventh Circuit.[12]

## III. <u>CONCLUSION</u>

For the foregoing reasons, Petitioner's instant § 2241 application will be dismissed, with prejudice, for lack of jurisdiction.

An appropriate Order accompanies this Opinion.

<u>s/Renee Marie Bumb</u>
**RENÉE MARIE BUMB**
**United States District Judge**

Dated:<u> November 23, 2010</u>

---

[12]   Since Petitioner already filed a Section 2255 motion with his sentencing court, which was denied, this Court finds it not in the interests of justice to construe the Petition as Petitioner's Section 2255 motion, and will not forward it to the United States District Court for the Southern District of Florida.  Analogously, since denial of Petitioner's § 2255 motion was affirmed by the Eleventh Circuit (and the Eleventh Circuit denied Petitioner's request to file second/successive § 2255 motion), this Court finds it not in the interests of justice to construe the Petition as an application for leave to file a second/successive § 2255 petition and will not direct transfer of the Petition to the Court of Appeals for the Eleventh Circuit.  However, this Court's decision not to transfer the Petition should not be construed as barring Petitioner from re-seeking leave from the Court of Appeals for the Eleventh Circuit in order to file a second/successive § 2255 motion with the United States District Court for the Southern District of Florida, in the event Petitioner elects to do so.  That being said, no statement made in this Opinion shall be construed as expressing this Court's position that Petitioner's application for such leave should be deemed valid, either procedurally or substantively.